**YAFFE IRON AND METAL COMPANY, INC.,**
Petitioner,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 82–2036.

United States Court of Appeals, Tenth Circuit.

Oct. 3, 1985.

Michael W. Steinberg, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Land and Natural Resources Div., Dept. of Justice, Robert M. Perry, Gen. Counsel, Stanley H. Abramson, Associate Gen. Counsel, Ruth G. Bell, Asst. Gen. Counsel, Alan H. Carpien and Mary E.

Kale, Office of Gen. Counsel, E.P.A., Washington, D.C., were on briefs), for respondent.

Charles R. Nestrud of House, Holmes & Jewell, P.A., Little Rock, Ark., for petitioner.

Before HOLLOWAY, Chief Judge, LOGAN, Circuit Judge, and ARRAJ, District Judge *.

HOLLOWAY, Chief Judge.

This is an appeal by Yaffe Iron and Metal Company, Inc., (Yaffe) from an order of the Environmental Protection Agency (EPA). In that order the Administrator affirmed the decision of the administrative law judge assessing a civil penalty of $21,000 for violation of the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601, *et seq.* Yaffe was found to have violated regulations issued under § 6(e) of TSCA governing the disposal, storage, marking and record-keeping of polychlorinated biphenyls (PCBs), 40 C.F.R. Part 761 (1978). We have reviewed the Administrator's order, and the administrative record made in connection therewith. We uphold the findings of the violations but vacate the civil penalty imposed and remand for reconsideration of the penalty.

The issues raised by Yaffe in this court are essentially six: (1) did the Administrator err in granting EPA's motion to amend its complaint; (2) does the record support the Administrator's finding that Yaffe incinerated PCBs, thereby violating the disposal regulations; (3) does the record support the Administrator's finding that Yaffe violated the record-keeping requirements of the PCB regulations; (4) does the record support the Administrator's finding that Yaffe improperly stored PCBs; (5) did the Administrator err in excluding the testimony of Yaffe's expert witness; and (6) did the Administrator improperly rely upon the contents of complainant's Exhibit No. 1 in rendering his decision.

---

* The Honorable Alfred A. Arraj, United States District Judge for the District of Colorado, sitting by designation.

## I. FACTS

Yaffe is a scrap and warehousing business located in Muskogee, Oklahoma. Approximately 1% of its business consists of the purchase of scrap electric transformers from various electric utility companies, the breaking down of such transformers, and the salvage of primarily copper and steel which Yaffe then sells. Some of these transformers contained transformer oil laced with polychlorinated biphenyls (PCBs).[1]

Prior to October 1977, Yaffe disassembled the scrap transformers out of doors. In response to a complaint from an adjoining landowner, the Oklahoma State Department of Health (OSDH) inspected Yaffe's facilities and suggested that corrective measures be taken to prevent oil spills into a drainage ditch running along their west property boundary. TR. 149–150; I R.I.D. at 4.[2] Yaffe then remodeled a vacant building on its premises which allowed it to unload transformers inside this building, open them on a sloped concrete floor, resulting in the transformer oil being caught beneath the floor in a pit, and then pump the transformer oil to two overhead bulk storage tanks located outside the building on the west side.[3] The renovation of the transformer processing building was completed in April 1978 at a cost of $30,395. This renovation was approved by OSDH.

Due to the impending natural gas shortage, Yaffe installed a dual fuel burner system on the incinerator it used to burn the insulation from the copper wire contained in scrap transformers, using transformer oil as a fuel. Transformer oil stored in the bulk overhead storage tanks was placed in a mobile 400-gallon tank which was moved to the incinerator by a fork lift. The dual fuel burner was first used during the second or third week of January 1979. After about one week of operation, there was a fire in the incinerator and the oil pump was burned out. Approximately three weeks later, the dual fuel burner was again operative but after a week and a half of operation, there was a big fire which burned up the floor of the furnace, some of the piping, and the fan. The copper incinerator was not approved by the EPA nor did it meet the requirements of 40 C.F.R. § 761.-40(a) (1978).

OSDH again inspected Yaffe's premises on February 13, 1979. By letter dated April 25, 1979, OSDH notified EPA of a possible PCB contamination problem on Yaffe's premises. Tr. Ex. C–1. On May 2, 1979, EPA conducted an investigation of Yaffe's premises.[4] A follow-up inspection was conducted on May 17, 1979, at which

---

1. Polychlorinated biphenyls (PCBs) are a group of related chlorinated hydrocarbon chemicals frequently used in electrical transformers because of their chemical stability, fire resistance, and electrical resistance properties. They are especially attractive because they have a high ignition temperature or "flash point" which reduces the likelihood of fire in the event of transformer rupture. However, PCBs are extremely toxic to humans and wildlife, and pose carcinogenic and other risks to humans. In 1976 Congress designated PCBs as toxic substances under 15 U.S.C. § 2605(e) (1976), and in 1978, the EPA was empowered under TSCA § 6(e) to set forth specific rules governing the disposal and marking of PCBs. 40 C.F.R. part 761 (1978).
 *See Environmental Defense Fund v. E.P.A.,* 598 F.2d 62 (D.C.Cir.1978) and *Environmental Defense Fund v. E.P.A.,* 636 F.2d 1267 (D.C.Cir. 1980) for an excellent discussion of the Congressional history behind the regulation of PCBs.

2. Initial Decision by EPA administrative law judge designated as "I.D".

3. These two tanks were known as the north and south tanks during the proceedings.

4. Five samples were taken with the following results (TR. Exhibit C–2):

| Sample No. | Sample Location | PCB Concentration |
|---|---|---|
| YA–1 | Transformer oil from one of the transformers | Non detected |
| YA–2 | South overhead bulk oil storage tank | 730 ppm (Aroclor 1260) |
| YA–3 | North overhead bulk oil storage tank | 51.6 ppm (Aroclor 1260) |
| YA–4 | Mobile bulk oil storage tank | 681 ppm (Aroclor 1260) |
| YA–5 | Water from drainage ditch at southend of transformer building | 2.88 ppb (Aroclor 1260) |

time eleven samples were taken.[5] Of the 15 samples taken, EPA found PCB levels in excess of 500 ppm (which is the threshold level for regulation) in four of the samples—the south overhead bulk storage tank, the mobile bulk oil storage tank, and two 55-gallon drums. It is these four samples that formed the basis for the EPA action against Yaffe. No PCBs were detected in samples taken from oil inside the transformer building [YA–1 (transformer oil from transformer inside building); 137487 (oil taken from central drain inside transformer processing building); 137489 (oil from pipe leading from sump pump in transformer processing building connecting to overhead oil storage tanks)]. PCB was found in soil samples taken near the transformer building but not in levels equal to or greater than 500 ppm. [Samples 137488, 137491, 137494, and 137496].

The four transformer oil containers with PCB levels in excess of 500 ppm were not marked with the $M_L$ PCB label as required by 40 C.F.R. § 761.44(a) (1978), nor were there any markings indicating that these containers held PCBs. This marking violation was conceded by Yaffe.

Subsequent to the May 2 and 17 inspections and after receipt of the inspection reports and test results obtained pursuant to a Freedom of Information Act request by Yaffe, Yaffe conferred with the EPA to determine what corrective measures were necessary. As a result of numerous discussions with the EPA, Yaffe undertook several corrective measures. It transferred the contents of all the 55-gallon drums located at the side and rear of its transformer processing building, and the contents of the mobile bulk oil storage tanks to the south overhead storage tank. Second, it scraped up the soil from in front of the transformer building, stored it temporarily in existing barrels and, upon receipt of DOT approved 55-gallon drums, placed the soil and the old barrels, which were shredded, in these approved drums. Third, an earthen berm was constructed around the transformer processing building and a concrete curb was placed around the overhead bulk oil storage tanks to protect the drainage ditches from run-off and to comply with the spill-prevention control and countermeasure regulations. Fourth, Yaffe also purchased a filtering device to reduce the PCB concentration in the oil contained in the south overhead storage tanks and contracted with an engineering firm to design an incinerator which would comply with the PCB regulations, but abandoned this project due to expected adverse public reaction. The cost of these activities totaled approximately $15,650.

An EPA follow-up inspection was requested by Yaffe and conducted on December 17, 1979. Yaffe was found to have made "good faith and largely successful efforts to correct its PCB problems and that it will not pose further problems in the future." [II R. EPA's pre-hearing letter dated May 20, 1980, to Presiding Officer at

5. The following results were obtained by the May 17 inspection (Tr. Exhibit C–5):

| Sample No. | Sample Location | PCB Concentration |
|---|---|---|
| 137487 | Oil taken from central drain transformer processing building | None detected |
| 137488 | Surface soil in front of transformer processing building | Less than 500 ppm (Aroclor 1260) |
| 137489 | Oil from pipe leading from sump in transformer processing building connecting to oil storage tanks | None detected |
| 137490 | Oil from one 55 gallon drum on west side of transformer processing building | Water leaked out of sample, oil analyzed at 700 ppm (Aroclor 1254) |
| 137491 | Surface soil between transformer processing building and drainage ditch | Less than 500 ppm (Aroclor 1254) |
| 137492 | Oil from one 55 gallon drum at rear of transformer processing building | 11,000 ppm (Aroclor 1260) |
| 137493 | Thick, sticky substance on outer surface of 55 gallon drum sampled in 137492 | 4,000 ppm (Aroclor 1260) |
| 137494 | Surface soil between transformer processing building and drainage ditch | Less that 500 ppm (Aroclor 1260) |
| 137495 | Ash from floor of copper incinerator | None detected |
| 137496 | Surface soil from drainage ditch | Less than 500 ppm (Aroclor 1260) |
| 137497 | Water and soil sample from drainage ditch | Less than 500 ppm (Aroclor 1260) |

3]. Nevertheless, the EPA brought an enforcement action against Yaffe, alleging in its complaint numerous violations of TSCA and seeking a civil penalty of $50,000. Yaffe requested a hearing pursuant to § 16(a)(2)(A) of the TSCA, which was held on October 7, 1980, before an administrative law judge.

In March 1981 the ALJ rendered his initial decision finding that Yaffe had violated the marking, disposal, storage and record-keeping PCB regulations. He reduced the amount of the $50,000 civil penalty sought by the EPA and assessed a penalty of $21,000 against Yaffe.

Yaffe appealed this decision to the Administrator of the EPA. In August 1982 the Administrator issued a written opinion affirming the decision of the ALJ, including the assessment of the $21,000 civil penalty. Yaffee then filed a petition for review of the administrative order pursuant to § 16(a)(3) of the TSCA, 15 U.S.C. § 2615(a)(3) (1976) with this court.

## II. DISCUSSION

### A. Amendment of the complaint

■ Yaffe challenges the ruling allowing the post-hearing amendment of the complaint by the ALJ, which was affirmed by the Administrator. In the original complaint, paragraph eight, the EPA alleged that: "At a date prior to May 2, 1979, but after April 18, 1979, respondent burned PCB mixtures in a furnace located on its place of business in Muskogee, Oklahoma." II R. EPA complaint, ¶ 8. During the cross-examination of Yaffe's first witness, the ALJ said there was an apparent error in the date alleged. After discussion, the ALJ suggested that the EPA address the matter through a post-hearing motion to amend its complaint. Yaffe objected to any such amendment. It then went on with the presentation of its case and the hearing concluded on October 7, 1980. On October 15 the EPA filed a motion to amend the complaint with respect to the date with a supporting brief, and Yaffe filed a response and brief objecting to such an amendment. Opposing letter briefs

were also filed with the ALJ. On December 24, the ALJ entered an order granting EPA's motion to amend the complaint. Yaffe strenuously argues that the amendment allowed was an abuse of discretion, unfairly prejudicial, and violative of its due process rights.

The ALJ's order of December 24, 1980 granting the motion to amend found that there was no prejudice or surprise by granting EPA's motion; that long before the hearing, counsel for Yaffe had copies of reports of inspections and knew that the EPA case concerning the incineration charge was based, in large measure, on statements of Yaffe's employees and an inspection of the premises; that it was clear that the April 18, 1979 date was a typographical error, April 18, 1978 being the effective date of regulations; and that Yaffe would use a technical error to avoid liability for an alleged violation, which would be "contrary to reason and justice." The order refused to permit the EPA to amend to include a period prior to the effective date of the regulations. The order cited case law and Rule 15(b), F.R.Civ.P.

We find no error in the ruling. The EPA Consolidated Rules of Practice governing administrative assessment of civil penalties allow the complainant to amend the complaint once as a matter of right before the answer is filed and "[o]therwise the complainant may amend the complaint only upon motion granted by the Presiding Officer or Regional Administrator, as appropriate ..."—the respondent having 20 days from service of the amended complaint to amend his answer. 40 C.F.R. § 22.14(d) (1980). It is well settled that administrative pleadings are "liberally construed" and "easily amended." *Southern Colorado Prestress Co. v. Occupational Safety and Health Review Comm'n*, 586 F.2d 1342, 1347 (10th Cir.1978); *Mineral Industries & Heavy Construction Group v. OSHRC*, 639 F.2d 1289, 1292 (5th Cir.1981); *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 906 (2d Cir.1977). In fact, as one commentator has noted, "The most important characteristic of pleadings in the administrative

process is their unimportance. And experience shows that unimportance of pleadings is a virtue." 1 K. Davis, Administrative Law Treatise § 8.04 at 523 (1958).

The claims of abuse of discretion, unfair prejudice, and denial of due process are not convincing. It is true that the amendment was permitted after the introduction of all the evidence and the close of the hearing. Yaffe, however, had an opportunity to oppose the amendment through a brief submitted to the ALJ after the hearing, and by a letter dated November 13, 1980 to the ALJ.[6] The letter recognizes that testimony on the incineration of PCBs from mid-January to late February 1979 was submitted at the hearing by Yaffe, although Yaffe claims that this was important to defend the record-keeping count. *See* November 13, 1980 letter at 2. In the letter respondent states that it firmly believes that the record it established to defend the record-keeping count was sufficient to cause a dismissal of any allegation on an incineration count. Thus, it is apparent that evidence was offered by Yaffe on the incineration issue.

Yaffe argues that the amendment violated the timely notice requirement of the Administrative Procedure Act provided by 5 U.S.C. § 554(b). Yaffe claims that the documents provided to it prior to the hearing only put it on notice that the EPA intended to prove the incineration violation that had originally been alleged, *i.e.*, between April 18, 1979 and May 2, 1979. It is true that the Oklahoma State Department of Health letter dated April 25, 1979, which was the basis of the EPA investigation,

refers to the burning of PCBs in the present tense. However, the accompanying Oklahoma State Department of Health report dated February 16, 1979, stated that oil was pumped from a bay to an elevated storage tank and stored for burning in an aluminum smelting furnace; that photographs were taken of a transformer being opened, the storage tank and an overview of the area, as well as the furnace "where transformer oil was being burned." This report was made available to Yaffe prior to the hearing so that it is apparent the letter was referring to information obtained as a result of an inspection of Yaffe's operation in February of 1979. This put Yaffe on notice that the earlier incineration was known.

Moreover, Yaffe knew that the incinerator had been inoperable during the two week period actually alleged in the initial complaint. As the ALJ's order granting the amendment states "in fact, ... [Yaffe] knew that the case with respect to the charge of illegal incineration was based, in large measure, upon the statements of [its] employees and an inspection of the premises." Thus, Yaffe was apprised of the basis for the violation charged by the amendment. If a respondent to an agency action knows the basis of the amended complaint against it, it has been accorded due process if the record shows that it understood the issues and was afforded a full opportunity to meet the charges. *NLRB v. MacCay Radio & Telegraph Co.*, 304 U.S. 333, 349–50, 58 S.Ct. 904, 912–13, 82 L.Ed. 1381 (1938). We must conclude that the respondent Yaffe was not prejudiced by the order

---

6. The parties argue vigorously whether Yaffe asked for a reopening after the amendment was allowed. There was apparently no motion to reopen in technical conformity with the regulations. 40 C.F.R. § 22.28(a) (1980). However, in a letter brief dated November 13, 1980, Yaffe objected to the allowance of any amendment and stated that should an amendment be granted and upheld on appeal, at the very least a new trial would have to be granted to avoid possible prejudice. *See* Letter Brief dated November 13, 1980, II R. at 3. We therefore do not decide this issue on this technical point. Instead, as discussed in the text, we reject Yaffe's claim of error in the ruling granting the amendment on

the basis that the record shows that Yaffe had notice of the fact that violations of the incinerator regulations *before* April 18, 1979, were being claimed by the EPA and that Yaffe had an opportunity at the hearing to meet those claims.

Furthermore, we are unpersuaded by Yaffe's argument that it was deprived of an opportunity to present evidence to mitigate the civil penalty on the incinerator violation charge. Yaffe did present evidence which met the incinerator charge itself, as noted in the text. Moreover it also presented evidence of its efforts made to bring the incinerator into compliance with the EPA regulations, which went to the issue of mitigation.

allowing the amendment, denied an opportunity to defend, or deprived of due process.

## B. Incineration Violation

Yaffe challenges the findings on the incineration violation and argues strenuously that the record does not support those findings and the final decision adopting them.

■■■ At the outset we note that our review is restricted to determining whether the administrative decision is supported by substantial evidence under the Administrative Procedure Act standard, 5 U.S.C. § 706(2)(E), and to insuring that the decision was not arbitrary, capricious or otherwise an abuse of discretion. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284–85, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1975); *Curtis, Inc. v. Interstate Commerce Commission*, 662 F.2d 680, 685 (10th Cir.1981). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). Moreover, the possibility of drawing two inconsistent conclusions from the evidence does not mean that they are not supported by substantial evidence. The agency's findings as to facts supported by substantial evidence must be accorded due deference and may not be set aside by the reviewing court. *NLRB v. Brown*, 380 U.S. 278, 290–92, 85 S.Ct. 980, 987–89, 13 L.Ed.2d 839 (1965).

■■ Here the Administrator affirmed the ALJ's finding that Yaffe disposed of PCBs by incinerating them in an incinerator which failed to meet the requirements of Annex I of the PCB regulations. 40 C.F.R. §§ 761.10(b), 761.40 (1978). In late 1978 Yaffe had designed and built a dual fuel burner for the afterburner on its copper incinerator to utilize the transformer oil it collected from the scrap transformers it processed. The oil was stored in two

overhead bulk storage tanks (the north and south overhead tanks). The oil was then transported to the copper incinerator in a 400-gallon mobile bulk storage tank which had been specially designed for this purpose.

Yaffe first tested the dual fuel burner in the second or third week of January 1979, but a fire occurred about a week later which burned out the oil pump. This was repaired in February 1979. After approximately a week or two of additional use, a large fire burned up the floor of the furnace, some of the piping and the fan. Yaffe began repair of this damage, but abandoned it at the suggestion of EPA inspectors. The EPA test results indicated a PCB concentration of 51.6 ppm in the north overhead bulk oil storage tank, 730 ppm in the south overhead bulk oil storage tank, and of 681 ppm in the 400-gallon mobile bulk oil storage tank.

Yaffe maintained that the source of the oil in the 400-gallon tank unit came from the north tank, while the EPA maintained that the source was the south overhead tank. Because of the high PCB concentration in the 400-gallon mobile tank, the ALJ found that the source of the fuel burned was the south overhead tank. He concluded that a PCB mixture had been burned in the incinerator in violation of the disposal regulations. However, the determining factor for the ALJ was not the source of the fuel but the concentration of PCBs in the mobile oil storage tank used to transport the fuel to the furnace (681 ppm). The Administrator reasoned that "since [Yaffe] admitted to burning fuel in the incinerator and at least some of the fuel had been proven to be a PCB mixture (whichever storage tank was the source), the finding of the disposal violation is affirmed." Final Decision at 8.

While one might draw the opposite conclusion from the testimony at the hearing that the fuel source was the north tank, nevertheless, the Administrator's finding was supported by substantial evidence. *Curtis, supra*, 622 F.2d at 685. We are

satisfied that a reasonable mind could accept the evidence presented at trial, both from testimony and test results, as supporting the conclusion that a PCB mixture (any mixture which contains 0.05 percent (500 ppm) or greater of a PCB chemical substance ... 40 C.F.R. § 761.2(w) (1978)) was burned.

Finally, we find no error in the Administrator's reliance on the test results for the oil sample taken from the mobile tank. Yaffe maintains that the sample was not representative of the oil in the 400-gallon tank due to volatilization of PCBs, and therefore was not representative of the oil burned. We are satisfied that the record supports the finding of the ALJ that the oil in the mobile tank was a PCB mixture. The record thus supports the finding of the disposal violation by the ALJ and the Administrator.

## C. Record-keeping violation

■ The PCB regulations require that each owner or operator of a facility using or storing at any one time at least 45 kilograms (99.4 lbs) of a PCB mixture maintain records on the disposition of PCBs. 40 C.F.R. § 761.45(a). The presiding officer assessed a $2,000 civil penalty against Yaffe for failure to maintain such records, having found that Yaffe disposed of PCBs in its copper furnace (see discussion at I B., supra), and thus came within the record-keeping requirements of this rule. Yaffe challenges this ruling on two grounds: (1) it did not dispose of PCBs and therefore was not required to keep records; and (2) the regulations are too vague to be enforceable and that to assess a civil penalty for such a violation would violate its due process rights.

The first contention we reject, having found that Yaffe did, in fact, burn PCBs and thereby dispose of them. See discussion at II B., supra. As to the second

contention, we conclude that the record-keeping regulations are not so vague as to violate Yaffe's due process rights. The records required by the regulations are to be used by the owner of PCBs as a basis for preparing an annual report, for insuring appropriate control and handling of PCBs, and to assist the agency in enforcement of the regulations. Final Decision at 13. While we agree that the regulations do not precisely specify the records to be kept, they are very detailed as to what information must be included in the annual report such as the dates when PCBs are placed into storage for disposal, the quantities of PCBs stored, the number of PCB transformers, and the total weight in kilograms of any PCB chemical substances and PCB mixtures contained in the transformers, etc. 40 C.F.R. § 761.45(a) (1978).

Yaffe could have easily determined from the requirements for the contents of the annual report the type of records needed to properly prepare the annual report. The record-keeping regulations do not violate Yaffe's due process rights, nor did the presiding officer or the Administrator abuse their discretion in assessing a penalty against Yaffe for the record-keeping violation.

## D. Storage violation

■ Yaffe was assessed a $10,000 civil penalty[7] for violating the storage requirements for PCB containers.[8] 40 C.F.R. § 61.42(b)(1) (1978). Section 761.42(b)(1) requires that PCB containers be stored for disposal in facilities which meet certain requirements as to the roof, walls, and floors.

The Administrator and the presiding officer found that Yaffe had not stored two 55-gallon drums containing PCB mixtures in accordance with the regulations. One of the drums was located outside, completely in the open without any protection. The

---

**7.** As noted in Part I, this $10,000 penalty was part of the total $32,000 civil penalty assessed, which total penalty was reduced to $21,000.

**8.** "PCB Container" means any package, can, bottle, bag, barrel, drum, tank, or other device used

to contain a PCB chemical substance, PCB mixture, or PCB article, and whose surface(s) has been in direct contact with a PCB chemical substance or PCB mixture. 40 C.F.R. § 761.2(u) (1978).

other drum (which contained 11,000 ppm of PCBs) was located outside of the transformer processing building under a corrugated metal roof but had no walls or curbing around it. We uphold the Administrator's findings that (1) the containers were PCB containers and (2) that they were improperly stored in violation of the PCB regulations. The findings are supported by substantial evidence in the record.

Yaffe argues that one of the 55-gallon drums was not a PCB container and therefore did not have to be stored in accordance with the regulations. It contends that the sample taken from the 55-gallon drum on the west side of the transformer building (which was found to have a PCB concentration of 700 ppm) was not representative of the contents of the drum. Its argument is two-fold: (1) the sample was improperly drawn because it was skimmed from the top of the drum when the sample source should have been mixed prior to sampling; and (2) the sample was not properly analyzed because the EPA laboratory failed to analyze both the oil and *water* layers of the sample because the water had leaked out during transit. However, the expert testimony supported the EPA position that the testing procedures used were proper and did not cause a distorted result. Moreover the finding that this 55-gallon drum was a PCB container is supported by substantial evidence.

Yaffe further contends that the penalty assessed was improper because the Administrator "doubled-up" the violations by considering the failure to have roof and walls a separate violation from the failure to have adequate floors and curbing. Yaffe bases this assertion on the fact that the EPA penalty assessment designated two penalties by breaking down the $10,000 into two parts—$5,000 for roof and walls, and $5,000 for floor and curbing. II R. EPA Complaint at 2. Again we find no merit in this argument. Both the presiding officer and the Administrator stated that their penalty assessment was not broken down in this fashion. Rather, their penalty was based on the fact that the PCB containers were not stored in accordance with

the regulations. The $10,000 assessment merely reflected the seriousness of the violation as a whole. We find no error in the Administrator's assessment of the storage violation penalty.

**E. Exclusion of expert testimony**

Yaffe claims error in the ALJ's refusal to permit Yaffe's expert witness to testify as to (1) the significance of PCB levels in the creek bordering Yaffe's property (Opening Brief for Petitioner at 42; Tr. 221–22), and (2) the potential for volatilization of transformer oil containing PCBs (Opening Brief for Petitioner at 42; Tr. 233–34).

 Absent an abuse of discretion, we will not interfere with the ALJ's decision on an expert's competence to testify, *Knight v. Otis Elevator Co.*, 596 F.2d 84 (3d Cir.1979), nor on whether such testimony is relevant to the issues being addressed. So long as an administrative agency is not arbitrary, it has some discretion in determining whether to admit expert evidence. *Alabama Ass'n of Ins. Agents v. Board of Gov. of Fed. Reserve Sys.*, 533 F.2d 224, 254 (5th Cir.1976) *vacated in part*, 558 F.2d 729 (5th Cir.1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). Moreover, the EPA rules of procedure for administrative hearings give latitude to the presiding officer in determining whether to exclude or admit evidence. "The Presiding Officer shall admit all evidence which is not irrelevant, immaterial, unduly repetitious, or otherwise unreliable or of little probative value ..." 40 C.F.R. § 22.22 (1980).

 The presiding officer found that the testimony regarding PCB levels in the creek bordering Yaffe's property was irrelevant and immaterial. We find no abuse of discretion on his part in excluding further testimony on the subject. PCB levels in the creek water were not an issue in this proceeding. Furthermore, the test results from the OSDH inspection were not admitted for the truth or falsity of the matters therein contained, but simply as part of the

materials introduced to show the basis of the EPA's initial inspection of Yaffe's premises.

As to the exclusion of testimony regarding the potential for volatilization of transformer oil containing PCBs (specifically the oil found in the 400-gallon drum used to transport oil to the incinerator), we also find no error. Yaffe's witness was an expert in the areas of water pollution, water quality and air quality, although he did have some experience in analyzing oil samples for PCBs. On the other hand, the EPA's expert witness was an analytical chemist and chemical engineer with extensive experience in PCB analysis.

We conclude that there was no reversible error in the exclusion of the expert testimony offered by Yaffe.

### F. Complainant's C-1 Exhibit

■ Yaffe argues that the Administrator erred in relying on the contents of Complainant's Exhibit No. 1 in assessing the civil penalty against Yaffe. The exhibit consists of Oklahoma State Department of Health and EPA correspondence, memoranda, laboratory reports and data pertaining to inspections and PCB samples from the Yaffe premises. The critical item was an October 4, 1977, letter from the Oklahoma State Department of Health to Yaffe's purchasing agent. This letter purportedly informed Yaffe that PCBs were found in a sample of oil taken from a drainage ditch at Yaffe's property line. The letter also purported to include copies of state laws and regulations governing PCB disposal.

There was, however, no evidence or testimony introduced as to whether Yaffe ever received this letter. There was objection made to the letter on the grounds of hearsay and that it was not shown to have been received by Yaffe. The letter was then accepted for the limited purpose of showing the basis of the EPA inspection of Yaffe's premises, *i.e.*, the Oklahoma Department of Health letter recording what it believed to be information sufficient to warrant an inspection by the EPA. Tr. 12. The difficulty arises from the fact that the ALJ treated the exhibit as having placed Yaffe on notice as to the presence of PCBs on its premises. Tr. 160–63.

The issue is troubling because of the reliance by the ALJ on the exhibit as proving notice to Yaffe concerning the presence of PCBs on its premises. The ALJ's opinion shows that he placed considerable reliance on the notice given to Yaffe about the PCBs being on its property by the October 4, 1977, letter from the Oklahoma State Department of Health.[9] We have

---

9. The ALJ's opinion stated in pertinent part (pp. 24–25):

Respondent contends herein that it was unaware that its premises contained PCBs and that may well be the case, although we have some difficulty giving credence to this contention. However, we do not believe that it may escape the imposition of a civil penalty by reason thereof. In short, Respondent made no attempt to determine what was the case. It must be remembered in this regard that Respondent is in the business of wrecking scrap transformers and disposing of the transformer oil contained therein. We surmise that even some laymen not so engaged had an awareness that transformer oil contained or might contain PCBs. *In addition, the Oklahoma State Department of Health informed Respondent in October 1977 that PCB's are present in electrical transformers, "[A]s you should be well aware," and that PCBs were found in a sample taken from a drainage ditch exiting Respondent's property. Respondent appears to have shown a lack of concern with*

*the Oklahoma statute and regulations dealing with the disposal of PCBs which were pointed out to it and copies of which were apparently sent to it.* In addition, even if we were to agree with Respondent that it received no transformers containing PCBs subsequent to the early part of 1978, which we do not, it appears from the May 1979 inspections conducted by Complainant's employees and the pictures of such premises that Respondent's facility probably had transformer oil received prior to the creation of a transformer processing building and the installation of overhead bulk storage tanks and that the area was somewhat contaminated with oil. Yet, Respondent made no effort to determine if such oil contained PCBs, to determine what its responsibilities were under federal and state law or even to consider whether the incineration of transformer oil complied with state disposal regulations, let alone comparable federal regulations. Under these circumstances, Respondent's alleged lack of knowl-

considered the EPA's several responses to this argument, including its contention that any error was harmless. We are not persuaded by such arguments and cannot agree that the ALJ did not rely considerably on the letter in assessing the civil penalty. We conclude therefore that the penalty assessed of $21,000 must be vacated and that this penalty issue must be remanded to the agency for reconsideration, without consideration being given to the October 4, 1977, letter (Tr. Ex. C–1) as having afforded notice to Yaffe of the presence of PCBs.

## CONCLUSION

In sum, we find no reversible error requiring that we set aside the findings by the EPA of the violations by Yaffe. However, the assessment of the civil penalty must be vacated for the reasons stated above and the cause is remanded to the agency for further proceedings to reconsider the civil penalty of $21,000 assessed against petitioner Yaffee.

IT IS SO ORDERED.

edge with respect to the PCB content of its transformer oil indicates a lack of responsibility and concern. ... It should be stated in Respondent's behalf, however, that Respondent expended monies subsequent to the state and federal inspections to cure deficiencies. It demonstrated, after the inspections by Complainant's employees, a cooperative attitude and attempted to comply with the pertinent regulations issued under the act and, in large measure, was successful in such attempt.
I R.I.D. at 24–25; (Emphasis added).