**ALL REGIONS CHEMICAL LABS, INC., Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 90–1715.**

United States Court of Appeals, First Circuit.

Heard April 5, 1991.

Decided May 6, 1991.

David J. Martel with whom Michael J. Rye and Doherty, Wallace, Pillsbury and Murphy, P.C., Springfield, Mass., were on brief for petitioner.

Karen L. Egbert, Environmental Defense Section, U.S. Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., Environmental & Natural Resources Div., Charles Openchowski, Office of Gen. Counsel, E.P.A. and Amelia Welt Katzen, Office of Regional Counsel, E.P.A. were on brief for respondent.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BREYER, Circuit Judge.

On Friday, June 17, 1988, two fires broke out in Springfield, Massachusetts, at a chemical plant where appellant All Regions Chemical Labs, Inc. ("All Regions") stored TCT, a chemical used to chlorinate swimming pools. The first fire began at 10:00 a.m.; the second, thirteen hours later, at 11:00 p.m. The fires released about 180,000 pounds of chlorine gas into the atmosphere, creating a chlorine cloud over the city and forcing the evacuation of about 30,000 people that night. Apparently, the city fire department and state Department of Environmental Quality brought the fires under control fairly quickly without loss of life. All Regions eventually paid about $1,205,000 in clean-up costs.

Federal law, in particular, § 103(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), requires that a person in charge of a place that stores a hazardous chemical, such as TCT, "immediately notify" the Na-

tional Response Center (the "NRC") "as soon as he has knowledge of any release ... of [significant quantities of] a hazardous substance...." 42 U.S.C. § 9603(a). All Regions violated this statute, for it failed to notify the NRC "immediately." Rather, EPA found out about the first fire when a private citizen called it at 3:00 p.m. on June 17, five hours after the fire began. It found out about the second fire when the Massachusetts Department of Environmental Quality notified the NRC at 1:00 a.m. on June 18, two hours after the second fire began. All Regions itself gave the NRC formal notice several months later.

Because All Regions itself (the "person in charge") failed to notify the NRC on time, EPA has assessed a penalty against All Regions. Acting under the authority of a statutory provision that permits it to assess penalties of up to $25,000 per day for continuing violations of notification requirements, see 42 U.S.C. § 9609(b), EPA decided that (in light of the notice it received from others) All Regions' violation took place on *one* day. It then assessed a penalty 80 percent of the maximum permitted, namely $20,000. All Regions now petitions us for review, solely of the *amount* of the penalty. *See* 42 U.S.C. § 9609(b). It says that, under the circumstances (where it was busy fighting the fires, where state authorities received notice, where EPA received actual notice very soon), EPA acted "arbitrarily, capriciously," and therefore unlawfully, in setting the penalty so high. *See* 42 U.S.C. § 9609(b) (providing for judicial review of CERCLA Class II administrative penalties); 5 U.S.C. § 706(2) (setting general standards of review for agency actions); *cf. Yaffe Iron & Metal Co. v. EPA*, 774 F.2d 1008, 1014 (10th Cir.1985) (5 U.S.C. § 706(2) provides standard of review of penalty assessed under similar penalty provision in the Toxic Substances Control Act).

■ In reviewing EPA's decision we must pay particular attention to the interpretation that it gives its own rules and regulations. *See, e.g., Ford Motor Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980) (courts should

defer to agency's interpretation of its own regulation "unless demonstrably irrational"); *Donovan v. A. Amorello & Sons, Inc.*, 761 F.2d 61, 63 (1st Cir.1985) ("Courts must allow agencies to interpret their own rules, at least where those interpretations are reasonable."). And, we must take account of the fact that "the relation of remedy to policy is peculiarly a matter for administrative competence." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (internal quotations omitted); *see Kulkin v. Bergland*, 626 F.2d 181, 184 (1st Cir. 1980) ("Generally, administrative remedies or sanctions are subject to a very limited judicial review."). Applying these deferential standards of review, we cannot find the $20,000 "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ All Regions makes three arguments to the contrary, each of which is a variation on a single theme. It points out that, in determining the amount of the penalty, the Administrative Law Judge decided to borrow standards that apply to related cases, cases involving violations of the Toxic Substances Control Act, *see* 15 U.S.C. § 2615(a); Guidelines for the Assessment of Civil Penalties under Section 16 of the Toxic Substances Control Act [hereinafter "TSCA Guidelines"], 45 Fed.Reg. 59,770 (September 10, 1980), and CERCLA "Class I" violations, *see* 42 U.S.C. § 9609(a)(3). Those standards, as reduced to writing in the Federal Register, provide that the ALJ is to examine (1) the *probability* of damages (measured on a scale of 1 to 6), and (2) the *extent* of the potential damage ("major," "significant," or "minor"). *See* TSCA Guidelines, 45 Fed.Reg. at 59,771. The TSCA guideline would indicate a $20,000 fine here (80 percent of maximum) if the probability of damage was high and the extent of the damage was "major." *Id.* While All Regions agrees that release of 180,000 pounds of chlorine could cause "major" damage, it asks how the ALJ could find a high probability that, in the circumstances, its violation could have caused such damage. After all, EPA received the proper notice within a few hours

of the release (though not from All Regions), other authorities were dealing appropriately with the problem, and, after having received notice, EPA did little, becoming involved at the scene of the accident only in a very limited way.

The answer to this question lies in the TSCA Guidelines themselves. Those Guidelines say:

The probability of harm, as assessed in specifying circumstances, will always be based on the risk inherent in the violation *as it was committed.* In other words, a violation which presented a high probability of causing harm when it was committed (and/or was allowed to exist) must be classified as a "high probability" violation and *penalized* as such, even if through some fortuity no actual harm resulted in that particular case.

TSCA Guidelines, 45 Fed.Reg. at 59,772 (emphasis in original). Here, when the violation was committed, that is, when the release first took place, failure to notify EPA might well have caused serious harm. Whether or not it would have done so depended upon whether other, third parties, did or did not happen to notify EPA, and upon whether or not responses by other agencies proved adequate. EPA might well decide, for purposes of enforcing its own notification requirements, to consider notice by third parties and adequate responses by other agencies as "fortuities" that the ALJ need not take into account in assessing the amount of a penalty. Given the legal power of the agency to interpret its own regulations, *see Ford Motor Credit Co.*, 444 U.S. at 565, 100 S.Ct. at 798; *A. Amorello & Sons*, 761 F.2d at 63, and our limited basis for review, *see Glover Livestock*, 411 U.S. at 185–86, 93 S.Ct. at 1457–58; *Kulkin*, 626 F.2d at 184, we cannot find such a decision arbitrary, or otherwise unlawful.

All Regions pursues its basic theme by arguing that the ALJ's penalty assessment depended upon the ALJ's belief that prompt notification would, in fact, have made a difference, which, adds All Regions, it indisputably would not have done. In support, it points to a half sentence in the ALJ's opinion, where he says:

One can only surmise what may have occurred if ... EPA had been notified immediately as required.

*In the Matter of All Regions Chemical Labs, Inc.*, Docket No. CERCLA–I–88–1089 (EPA December 1, 1989), Slip Op. at 42. This comment occurs, however, in a discussion of the "circumstances of the violation," which begins as follows:

Circumstances may be described as the probability of harm based upon the risk inherent in the violation even though, through some fortuity, no actual harm resulted. [citing TSCA Guidelines, 45 Fed.Reg. at 59,772] Where, as here, the violation is a failure to notify or report, the risk inherent in the violation is a measure of the effect of such failure on the Agency's ability to implement the other provisions of the act, even though through some fortuity, the full potential harm may not have resulted.

*Id.* at 41. The discussion, taken as a whole, suggests that the ALJ was considering what might have happened in the absence of the "fortuitous" events of adequate responses and notification by other parties. As previously mentioned, in our view, the ALJ could properly consider such outside events, for penalty assessment purposes, as "fortuities."

■ All Regions tries a third variation by pointing to a TSCA regulation that reads as follows:

The probability of harm, as assessed in evaluating circumstances, will always be based on the risk inherent in the violation as it was committed.

45 Fed.Reg. at 59,772. All Regions says that "the probability of harm as a result of the violation was no more significant than the probability of harm prior to the violation because the facts conclude that nothing different would have been done." Again, given the agency's legal power to assess penalties in terms of what *might* have happened (in the absence of appropriate responses and notifications by others), rather than what *did* happen, All Regions' argument is unconvincing.

■ Finally, All Regions makes a different argument. It says that EPA failed to

give it adequate credit for the $1,205,000 it spent in clean-up costs. It says that EPA had to reduce the $20,000 penalty in light of a TSCA Guideline that says:

*Money spent by the violator in cleaning up or otherwise mitigation [sic] the harm caused by the violation.* Normally there should be no reduction for these costs, since it is part of the cost of violation. However, there may be instances where the cost of penalty, plus the cost of cleanup, are excessive for the particular violation, so that some credit for these expenditures should be given.

TSCA Guidelines, 45 Fed.Reg. at 59,775. All Regions argues that because its clean-up costs "dwarf the amount of the penalty," it should receive a penalty reduction of 35 percent.

All Regions, however, interprets the regulation in a rather odd way. On its interpretation, the greater the clean-up costs, the *lower* a nonnotification penalty ought to be. However, since clean-up costs will often be associated with harm, larger costs would often mean larger harm, calling for a higher, not a lower, penalty. A more reasonable interpretation of this regulation would focus on the words "excessive for the particular violation." It would interpret the regulation to mean that where clean-up costs and penalty, taken together, *"are excessive for the particular violation,"* the agency may give the violator some credit for having paid large clean-up costs. The record before us does not require a finding that clean-up costs plus penalty were "excessive" for the violation at issue. Perhaps All Regions means that both together are excessive given the small likelihood that the failure to notify caused any harm. But, as so stated, the argument becomes a fourth variation on the same basic theme, and we reject it for the reasons previously given.

For these reasons, *the petition for review is denied and the EPA's final penalty order is affirmed.*