MUSTANG ENERGY CORP., formerly known as Mustang Fuel, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

El Paso Natural Gas Company, Intervenor.

No. 86–2259.

United States Court of Appeals, Tenth Circuit.

Oct. 17, 1988.

---

David O. Cordell, Mustang Energy Corp., Oklahoma City, Okl., and Carroll L. Gilliam, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C. (Craig W. Hulvey and George C. Garikes, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., with them on the briefs), for petitioner.

Joanne Leveque (Jerome M. Feit, Sol., and Catherine C. Cook, Gen. Counsel, with her on the brief), F.E.R.C., Washington, D.C., for respondent.

Before ANDERSON and BALDOCK, Circuit Judges, and PARKER,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Mustang Energy Corporation ("Mustang") petitions for review under 15 U.S.C. § 3416(a)(4) of orders of the Federal Energy Regulatory Commission ("FERC") establishing "fair and equitable" rates for the transportation of natural gas by Mustang and ordering refunds. We affirm the FERC orders in most respects but modify the orders in part.

I.

Mustang is an intrastate pipeline transporting natural gas in the state of Oklahoma. Prior to 1981, Mustang transported gas from gas producing areas to electrical generating plants for Oklahoma Gas and Electric Company ("OG & E"). In 1981, Mustang entered into a Transportation Agreement with El Paso Natural Gas Company ("El Paso"). The Transportation Agreement primarily relied on excess capacity in Mustang's existing facilities, but also required Mustang to construct a new segment of pipeline, an additional compressor station and certain gathering lines. On September 30, 1981, Mustang began transporting gas on behalf of El Paso pursuant to section 311(a)(2) of the Natural Gas Poli-

* Hon. James A. Parker, U.S. District Court, New Mexico, sitting by designation.

cy Act of 1978 ("NGPA"). 15 U.S.C. § 3371(a)(2). At issue here is FERC's determination of "fair and equitable" rates for transportation service under the NGPA.

Section 311(a)(2) allows the Commission to authorize an intrastate pipeline to transport natural gas on behalf of an interstate pipeline or local distribution company without triggering general FERC jurisdiction under the Natural Gas Act. Section 311(a)(2) provides as follows:

"§ 3371(a)(2)(A) In general. The Commission may, by rule or order, authorize any intrastate pipeline to transport natural gas on behalf of

(i) any interstate pipeline; and

(ii) any local distribution company served by any interstate pipeline.

(B) Rates and charges.

(i) Maximum fair and equitable price. The rates and charges of any intrastate pipeline with respect to any transportation authorized under subparagraph (A), including any amount computed in accordance with the rule

prescribed under clause (ii), shall be fair and equitable and may not exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service.

(ii) Commission Rule. The Commission shall, by rule, establish the method for calculating an amount necessary to

(I) reasonably compensate any intrastate pipeline for expenses incurred by the pipeline and associated with the providing of any gathering, treatment, processing, transportation, delivery, or similar service provided by such pipeline in connection with any transportation of natural gas authorized under subparagraph (A); and

(II) provide an opportunity for such pipeline to earn a reasonable profit on such services."

15 U.S.C. § 3371.[1] *See also* 15 U.S.C. § 3431(a)(2)(A)(ii) (transportation autho-

---

**1.** The applicable regulations implementing the "fair and equitable" standard of this statutory provision are found at 18 C.F.R. § 284.123:

"(a) *General Rule.* Rates and charges for transportation of natural gas authorized under § 284.122(a) shall be fair and equitable as determined in accordance with paragraph (b) of this section.

(b) *Election of rates.* (1) Subject to the conditions in §§ 284.8 and 284.9 of this chapter, an intrastate pipeline may elect to:

(i) Base its rates upon the methodology used:

(A) In designing rates to recover the cost of gathering, treatment, processing, transportation, delivery or similar service (including storage service) included in one of its then effective firm sales rate schedules for city-gate service on file with the appropriate state regulatory agency; or

(B) In determining the allowance permitted by the appropriate state regulatory agency to be included in a natural gas distributor's rates for city-gate natural gas service; or

(ii) To use the rates contained in one of its then effective transportation rate schedules for intrastate service on file with the appropriate state regulatory agency which the intrastate pipeline determines covers service comparable to service under this subpart.

(2)(i) *If an intrastate pipeline does not choose to make an election under paragraph (b)(1) of this section, it shall apply for Commission approval, by order, of the proposed*

rates and charges by filing with the Commission the proposed rates and charges, and information showing the proposed rates are fair and equitable.... Upon filing the petition for approval, the intrastate pipeline may commence the transportation service and charge and collect the proposed rate, subject to refund.

(ii) 150 days after the date on which the Commission received an application filed pursuant to paragraph (b)(2)(i) of this section, the rate proposed in the application will be deemed fair and equitable and not in excess of an amount which interstate pipelines would be permitted to charge for providing similar transportation service, unless within the 150 day period, the Commission either extends the time for action, or institutes a proceeding in which all interested parties will be afforded an opportunity for written comments and for the oral presentation of views, data and arguments. In such proceeding, the Commission either will approve the rate or disapprove the rate and order refund, with interest, of any amount which has been determined to be in excess of those shown to be fair and equitable or in excess of the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service."

18 C.F.R. § 284.123 (emphasis added). Because Mustang's transportation charges were not regulated by any state authority, Mustang filed with FERC under section (b)(2)(i) seeking approval

rized under § 3371(a) is not subject to Natural Gas Act jurisdiction); *Lear Petroleum Corp.*, 42 FERC ¶ 61,015, at 61,043 (1988) (purpose of Section 311(a)).

According to the legislative history of the NGPA, this provision

"facilitates development of a national natural gas transportation network without subjecting intrastate pipelines, already regulated by State agencies, to [FERC] regulation over the entirety of their operations. Instead, the intrastate pipelines are immunized from State or Federal regulation as common carriers and from [FERC] regulation under the Natural Gas Act. The intrastate pipelines are only subjected to [FERC] regulation under this legislation to the extent the intrastate pipeline is involved in an authorized sale of natural gas to interstate pipelines or an authorized transportation of natural gas on behalf of interstate pipelines."

H.Rep. No. 95–543, 95th Cong. 1st Sess. 45 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 7659, 7712.[2] This provision was adopted by the Conference Committee, but the conference report provides little additional guidance regarding the "fair and equitable" standard to be applied to transportation charges.[3]

Pursuant to FERC regulations, Mustang filed for approval of a proposed transportation rate of 22.29 cents per Mcf for the first two years of the Transportation Agreement. On May 20, 1982, FERC issued an order authorizing the transportation and approving the proposed rate for a one-year period, and directing Mustang to file an application each year to justify the existing rate or any change in the transportation rate. *Mustang Fuel Corp.*, 19 FERC ¶ 61,168, *clarified on rehearing, Mustang Fuel Corp.*, 20 FERC ¶ 61,057 (1982). The Transportation Agreement approved by FERC also included a "minimum bill" provision, whereby El Paso was charged each month for transportation of a "minimum daily quantity"[4] whether or not that volume was actually transported and delivered to El Paso.

On September 30, 1982, Mustang filed a petition for rate approval seeking to increase the transportation rate to 32.21 cents per Mcf, effective October 1, 1982. Upon filing, the increased rate became effective and Mustang collected that rate from El Paso, subject to refund. On May 23, 1983, Mustang once again filed for a rate increase, seeking approval of a rate of 34.30 cents per Mcf. Again, this increase became effective upon filing, subject to refund. On May 1, 1984, Mustang filed for another change in the transportation rate. The May, 1984 filing, and any subsequent filings by Mustang, are not the subject of this petition. Thus, this court is concerned only with the proper transportation rates for two "locked-in" periods, October 1, 1982 through May 22, 1983, and May 23, 1983

of its proposed rates as fair and equitable. Other regulatory provisions impose reporting requirements on intrastate pipelines seeking to transport natural gas under NGPA § 311(a).

**2.** *See generally* Peters, Interstate and Intrastate Pipeline Transportation and Sale of Gas Under Section 311 of the National Gas Policy Act of 1978, 2 *J. Energy Law & Pol'y* 143, 153–55 (1982); 1 American Gas Ass'n, *Regulation of the Gas Industry* § 8.04[2] (1987).

**3.** "The conference agreement also gives the Commission authority to authorize intrastate pipelines to transport natural gas on behalf of any interstate pipeline, and any local distribution company served by any interstate pipeline. The rates and charges for such transportation are required to be fair and equitable, as defined. They may not exceed an amount which is determined by the Commission to be

reasonably comparable to the rates and charges which any interstate pipeline would be permitted to charge for providing a similar transportation service. Such a transaction would not affect the exempt status of any party to the transaction under the Natural Gas Act."
H.Conf.Rep. No. 1752, 95th Cong. 2d Sess. 107, *reprinted in* 1978 U.S.Code Cong. & Admin. News 9023.

**4.** The minimum daily quantity was 130,000 Mcf through May 22, 1983 and 58,000 Mcf through April 30, 1984. The minimum daily quantity was "equal to the aggregate minimum volumes which El Paso is required to take or pay for under its contracts with OG & E and independent producers. This minimum daily quantity was to be redetermined at least annually on the basis of El Paso's estimated throughput volumes." Brief of Petitioner at 13.

through April 30, 1984. Rates subsequent to April 30, 1984 are not considered here.

Pursuant to its regulations, FERC instituted rate proceedings and convened staff panels to review the Mustang filings. *See, e.g., Mustang Fuel Corp.*, 22 FERC ¶ 61,231 (1983) (order instituting rate proceeding on September 30, 1982 filing). The two proceedings were ultimately consolidated and heard by a FERC staff panel on May 30, 1984. Mustang and the Commission staff were given the "opportunity for oral presentations of data, views, and arguments concerning both proposed rate increases." *Mustang Fuel Corp.*, 31 FERC ¶ 61,265 at 61,527 (1985). FERC ultimately issued an order setting fair and equitable rates on June 4, 1985. That order established a fair and equitable rate for the first period—October 1, 1982 through May 22, 1983—of 28.93 cents per Mcf, and for the second period—May 23, 1983 through April 30, 1984—of 33.75 cents per Mcf, and ordered Mustang to pay refunds for excess collections. FERC also invalidated the minimum bill provision and ordered Mustang to refund any charges collected for natural gas not actually transported for El Paso.[5] Finally, FERC ordered Mustang to pay interest on the refunded amounts. *Id.* at 61,535. According to Mustang, the refund obligation totals more than $8 million, plus accumulated interest. Brief of Petitioner at 18 n. 26.

Mustang urges us to reverse the FERC orders reducing the transportation rate and eliminating the minimum bill provision. Mustang argues (1) that the rates approved by FERC violate the substantive standard

---

5. FERC also invalidated the minimum bill for the period prior to October 1, 1982, and ordered a refund for collections under the minimum bill provision during the first year of the Transportation Agreement. On rehearing, FERC found that the language of its earlier orders could be read as approving the minimum bill provision for that period and it vacated the initial refund order. *Mustang Fuel Corp.*, 36 FERC ¶ 61,001, at . 61,004–05 (1986). Thus, Mustang was allowed to collect from El Paso under the minimum bill provision until October 1, 1982.

6. We previously considered the NGPA, including section 311, in *Oklahoma v. FERC*, 661 F.2d 832 (10th Cir.1981), *cert. denied*, 457 U.S. 1105,

of section 311(a)(2), that is, that they are not "fair and equitable"; (2) that elimination of the minimum bill provision also violates the same substantive standard; (3) that the Commission applied an improper methodology to determine the fair and equitable transportation rate, or, in the alternative, improperly applied its own methodology; (4) that the Commission improperly ordered refunds and assessed interest; and (5) that the Commission's procedures denied Mustang due process of law.

Apparently, we are the first court to consider the "fair and equitable" rate standard of section 311(a)(2).[6] Thus our review focuses on two questions: first, has FERC properly interpreted the statutory language; and second, has FERC properly applied the statutory standard in this case?

## II.

■ Our standard of review is necessarily deferential to FERC's interpretation of the statutory language.

"Our first inquiry is whether 'Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the. agency, must give effect to the unambiguously expressed intent of Congress.' *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 [104 S.Ct. 2778, 2781, 81 L.Ed.2d 694] (1984) (footnote omitted). We will defer when an agency has chosen between alternative possible constructions of an ambiguous statute:

---

102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982), where we upheld certain provisions of the NGPA against a constitutional challenge. In addition, courts have considered various NGPA regulations promulgated by FERC, including some related to section 311. *See, e.g., Associated Gas Distributors v. FERC*, 824 F.2d 981, 1001–03 (D.C.Cir.1987) (reviewing FERC regulations), *cert. denied*, —— U.S. ——, 108 S.Ct. 1468, 99 L.Ed. 698 (1988); *Laclede Gas Co. v. FERC*, 722 F.2d 272, 275–76 (5th Cir.1984) ("rolled-in" pricing of section 311 gas). However, neither the parties nor this court have been able to identify any prior judicial consideration of the "fair and equitable" standard.

'If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'

Chevron, U.S.A., 467 U.S. at 843 [104 S.Ct. at 2782] (footnotes omitted). Where the plain words of the statute do not answer a particular question, the agency interpretation must be reasonable, but it need not be the only reasonable interpretation or the interpretation that the reviewing court would adopt. See, e.g., Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125 [105 S.Ct. 1102, 1107, 84 L.Ed.2d 90] (1985). A reviewing court will defer to an agency interpretation of an ambiguous statute unless the agency interpretation is contrary to the policies Congress sought to implement in enacting the statute."

Martin Exploration Management Co. v. FERC, 813 F.2d 1059, 1065 (10th Cir.1987) (citations omitted), rev'd on other grounds, —— U.S. ——, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988);[7] cf. South Carolina Public Service Auth. v. FERC, 850 F.2d 788, 791 (D.C.Cir.1988); Puerto Rico Elec. Power Auth. v. FERC, 848 F.2d 243, 246–47 (D.C. Cir.1988). For reasons explained below, we find that the "fair and equitable" standard in section 311(a)(2) is subject to a variety of interpretations. Accordingly, we review FERC's interpretation of that language to determine (1) if it is reasonable, and (2) if it is contrary to Congressional policies.

In section 311(a)(2) Congress directed FERC to establish "fair and equitable" rates for intrastate pipelines transporting natural gas in interstate commerce.[8] In addition, the rates "may not exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service."[9]

7. Despite this deferential standard of review, in Martin this court reversed FERC's interpretation of certain NGPA provisions as "contrary to the clear intent of Congress." Martin, 813 F.2d at 1065. On appeal, the Supreme Court reversed our decision and reinstated FERC's interpretation of the statute. See Martin 108 S.Ct. at 1768–69.

8. One commentator has suggested that the "fair and equitable" standard is essentially an empty standard.

"An incident that occurred during the long and tortuous negotiations that led to the passage of the Natural Gas Policy Act of 1978 ... helps to illustrate the empty nature of 'do right' standards like 'just and reasonable.' Congress decided that it wanted to authorize sales of natural gas from intrastate pipelines to interstate pipelines, subject to FERC regulation of the price charged for such sales, but the legislature was in hopeless disagreement concerning the standard that FERC should use in regulating the price at which such sales are made. Congress considered and rejected use of the Natural Gas Act's 'just and reasonable' standard, which had been used for similar purposes for the prior four decades. Legislators in favor of generous price regulation objected because of the existence of many court decisions applying the just and reasonable standard in a manner that seemed to permit or require an agency to set prices at artificially low levels. E.g., The Permian Basin Area Rate Cases, 390 U.S. 747 [88 S.Ct. 1344, 20 L.Ed.2d 312] (1968) (affirming rates based on average historical costs). Legislators who preferred stringent price regulation objected because of the many other court decisions applying the standard in a manner that appeared to permit inflated prices. E.g., American Public Gas Ass'n v. FPC, 567 F.2d 1016 (D.C.Cir.) (affirming rates based on projected future costs), cert. denied, 435 U.S. 907 [98 S.Ct. 1456, 55 L.Ed.2d 499] (1977). Because the legislators could not agree on a real standard, and because each objected to some interpretations of the traditional empty standard, they could avoid impasse only by adopting a new empty standard. Thus was born the 'fair and equitable' standard contained in [§ 311 of the Natural Gas Policy Act]."

Pierce, The Role of Constitutional and Political Theory in Administrative Law, 64 Tex.L.Rev. 469, 474 n. 18 (1985).

We make no comment on Professor Pierce's characterization of the standard apart from noting that the statutory language leaves substantial discretion to FERC in the setting of transportation rates.

9. According to section 311(a)(1)(B), an interstate pipeline providing similar transportation service would be allowed to charge rates that

The statute also imposes two substantive components of the "fair and equitable" standard. First, the rate must "reasonably compensate any intrastate pipeline for expenses incurred." Second, the rate must "provide an opportunity for such pipeline to earn a reasonable profit on such services." FERC's adjudications under section 311(a)(2) consistently recognize these statutory standards. *See Mustang Fuel Corp.*, 31 FERC at 61,527. Unfortunately, however, neither FERC regulations nor adjudications provide a clear, concise statement of the Commission's interpretation of the statute. FERC commonly discusses the question in general terms, with reference to the statutory language:

> "Section 311(a)(2) of the NGPA requires that a rate charged by an intrastate pipeline for transportation service rendered on behalf of an interstate pipeline or a local distribution company must be 'fair and equitable and may not exceed an amount which is reasonably comparable to the rates and charges which interstate pipelines would be permitted to charge for providing similar transportation service.' A 'fair and equitable' rate is defined in the Statement of Managers for the NGPA as one that reasonably compensates an intrastate pipeline for expenses incurred by the pipeline for providing the service plus an opportunity for the pipeline to earn a reasonable profit."

*Mustang Fuel Corp.*, 19 FERC at 61,318 (footnote omitted). It is clear, however, that the Commission has chosen to implement section 311(a)(2) through traditional cost-of-service ratemaking.

---

are "just and reasonable (within the meaning of the Natural Gas Act)." Thus, despite Congress' choice of different words to describe the rate for intrastate pipelines, the statute suggests that the two standards are, at least, "reasonably comparable."

Moreover, the language of this clause—"may not exceed"—suggests that the comparison with interstate rates is to serve as an upward limit on "fair and equitable" rates. *See Mustang Fuel Corp.*, 31 FERC at 61,534. Because the argument here is that the approved rates are too low, we do not have occasion to examine this provision of the statute in detail.

"Section 311 on its face permits cost-based transportation rates by requiring the Commission to establish a method for calculating an amount necessary to compensate such pipelines for their expenses and to provide an opportunity to earn a reasonable profit. The setting of rates to recover costs and a reasonable profit is consistent with cost-based ratemaking."

*Lear Petroleum Corp.*, 42 FERC ¶ 61,015 at 61,042 (1988) (footnote omitted); [10] *see also Producer's Gas Co.*, 35 FERC ¶ 63,040 at 65,096–98 (1986) (ALJ decision); FERC, "Interim Regulations Implementing the Natural Gas Policy Act of 1978," 43 *Fed. Reg.* 56,448 at 56,523–26 (1978) (preamble to Part 284, Subpart B regulations). References in the Conference Report on the NGPA also indicate Congress intended for FERC to rely on cost-of-service criteria to set fair and equitable rates. *See* H.R.Rep. No. 1752, 95th Cong., 2d Sess. 107–09, *reprinted in* 1978 U.S.Code Cong. & Admin. News 9023–25 (discussing section 311(b)(2) establishing rate for sales of natural gas by intrastate pipelines); *Lear Petroleum*, 42 FERC at 61,042.

Mustang does not argue that "fair and equitable" rates should not be cost-based. To the contrary, Mustang argues that an intrastate pipeline transporting gas under Section 311 *must* recover its costs and that the Commission may not impose a rate which does not actually cover the costs of transportation service. In other words, according to Mustang, FERC may not allow an intrastate pipeline to lose money on a section 311(a)(2) transaction because, if the pipeline loses money it obviously has not been "reasonably compensated" for its ex-

---

**10.** In *Lear Petroleum*, the Commission rejected the pipeline's argument that section 311(a) required FERC to adopt market-based, rather than cost-based, rates.

Under cost-of-service ratemaking, we are told by Mustang, "a unit transportation rate is determined by dividing the total annual (or annualized) cost of providing service (inclusive of a return on the pipeline's investment) by the annual (or annualized) volumes to be transported." Brief of Petitioner at 5 n. 5; *see Producer's Gas Co.*, 35 FERC ¶ 63,042, at 65,119 (1986); Means and Cohn, Common Carriage of Natural Gas, 59 *Tulane L.Rev.* 529, 558–60 (1985).

penses or given an "opportunity to earn a reasonable profit." *See* Brief of Petitioner at 27–30; Reply Brief of Petitioner at 17–18.

FERC on the other hand, emphasizes that costs and the opportunity for a profit are to be considered in rate *design*. That is, according to FERC, a "fair and equitable" rate is one that allows the pipeline to recover costs and make a profit when the volumes of gas considered in setting the rate materialize as the parties to the transportation agreement expect. *See Mustang Fuel Corp.*, 36 FERC ¶ 61,001 at 61,004 (1986).

The difference between the two approaches becomes particularly important when, as here, we review transportation rates retrospectively. For example, the rate which Mustang originally filed with FERC for the October 1, 1982 to September 30, 1983 rate period was based on certain projections of costs and volumes of gas to be transported.[11] Yet the actual volume transported was substantially below that anticipated, and as a result, the unit rate charged for transportation was inadequate to recover Mustang's costs.[12]

■ The dispute can also be characterized as a question of risk allocation. FERC's position is that the intrastate pipelines should bear the risk of the underutilization of facilities constructed for section 311(a) transportation; if the rate is initially *designed* to recover costs and allow for a profit, the intrastate pipeline must bear the risk of financial losses resulting from any variance from design projections. Mustang argues that the intrastate pipeline should be protected (or, more accurately, allowed to protect itself through its contract with the interstate pipeline) from the financial risks of underutilization.

FERC offered a lengthy explanation of its rationale for allocating these risks to Mustang and intrastate pipelines generally in its initial order in this case:

"The question of who should bear the risk of underutilization must be viewed in the context of our overall approach toward implementation of section 311. Section 311 was intended to:

save interstate pipelines great expense by avoiding the need to duplicate intrastate pipeline routes in order to obtain natural gas from producing areas presently served only by intrastate pipeline systems ... [The section] facilitates development of a national natural gas transportation network, without subjecting intrastate pipelines, already regulated by state agencies, to [FERC] regulation over the entirety of their operations. [citing H.R.Rep. No. 543, 95th Cong., 2d Sess. 45 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 7712 (emphasis omitted).]

In implementing section 311 consistent with this intent, the *Commission has repeatedly expressed concern that interstate customers not bear unwarranted risks as a result of an interstate pipeline making transportation arrangements with intrastate pipelines* rather than constructing its own new transportation facilities.

If an interstate pipeline wishes to construct new transportation facilities, it must first obtain certification from the Commission under section 7(c) of the Natural Gas Act that such facilities are in the public convenience and necessity.... The Commission can put conditions (e.g., a minimum throughput requirement) on a certificate that impose the risk of underutilization on the pipeline....

However, if the interstate pipeline contracts with an intrastate pipeline which constructs new facilities to transport on behalf of the interstate pipeline under section 311, the new facilities can be con-

---

**11.** We understand that this simplistic explanation glosses over the question of rate base allocation between El Paso and OG & E, but do not feel that this additional complexity would materially change our basic analysis—the review of FERC's statutory interpretation.

**12.** Of course, the minimum bill provision was designed to protect Mustang from this possibility. *Mustang Fuel Corp.*, 31 FERC at 61,532. We consider the impact of the minimum bill provision *infra*.

structed without Commission review and approval.... Given the absence of Commission review of proposed intrastate facilities, *it is particularly important to encourage the intrastate pipeline to make a sound assessment of the need for and economic viability of the facilities.*

To the extent costs of building and operating intrastate facilities are reflected in the transportation rate approved by the Commission and charged to the interstate pipeline, the interstate pipeline in turn can automatically pass through such costs to its customers. Under NGPA section 601(b)(2)(B), any amount that an interstate pipeline pays for section 311 transportation and that does not exceed the transportation component approved by the Commission is deemed just and reasonable under the Natural Gas Act and so includable in the interstate pipeline's rates. Passthrough of such transportation costs to interstate customers is thereby guaranteed.

Under these circumstances, if an intrastate pipeline proposes to build a new facility solely for section 311 transportation and all costs of construction and operation of the facilities will be reflected in the section 311 transportation rate, the incentive for sound, economic assessment of the proposed facility may be reduced.... *Thus, in order to discourage the construction of uneconomical transportation facilities under section 311, we have required that transportation rates covering new facilities operated for section 311 transportation place the risk of underutilization on the intrastate pipeline."*

*Mustang Fuel Corp.,* 31 FERC at 61,530 (emphasis added, footnotes omitted); *see also Lear Petroleum,* 42 FERC at 61,051–54 ("A rate which permits the pipeline to recover the entire cost of building and operating the facility and a reasonable profit regardless of underutilization reduces the pipeline's incentive to make [a sound assessment of the need for the facilities], since the pipeline will make its profit in any event."); *cf. Columbia Gas Trans. Co. v. FERC,* 848 F.2d 250, 252–54 (D.C.Cir.1988) (discussing allocation of risk in FERC Order No. 436).

We find FERC's rationale persuasive, particularly in light of the Commission's primary objective under the Natural Gas Act "to protect consumers against exploitation at the hands of natural gas companies." *FPC v. Hope Gas Co.,* 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1943); *see Nat'l Ass'n of Regulatory Utility Comm'rs. v. FERC,* 823 F.2d 1377, 1386 (10th Cir.1987); *see also Martin Exploration* 813 F.2d at 1062–63 (purpose of NGPA). FERC's balancing of its obligation to interstate ratepayers with the duty to intrastate pipelines under section 311(a) is a reasonable and permissible interpretation of the statutory language.[13] *Cf. Associated Gas Distributors v. FERC,* 824 F.2d 981, 1003 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). In contrast, Mustang offers no evidence that Congress intended section 311(a)(2) to provide any sort of "hold harmless" protection for intrastate pipelines engaging in natural gas transportation or that interstate ratepayers otherwise protected under the Natural Gas Act should bear the financial risks of section 311

---

**13.** This conclusion is also supported by the Supreme Court's consideration of the comparable "just and reasonable" standard imposed on interstate pipelines by section 5(a) of the Natural Gas Act.

"[The Supreme] Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037.

No other rule would be consonant with the broad responsibilities given to the Commission by Congress; it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968); *see also id.* 390 U.S. at 797, 88 S.Ct. at 1375–76; *Mobil Oil Corp. v. FERC,* 417 U.S. 283, 306–09, 94 S.Ct. 2328, 2344–46, 41 L.Ed.2d 72 (1974); *Public Service Co. of New Mexico v. FERC,* 832 F.2d 1201, 1206 (10th Cir.1987).

transportation agreements. Our reading of the statute and the legislative history indicates that Congress intended that intrastate pipelines should be able to compete in the transportation market without bearing the burden of full regulation by FERC under the Natural Gas Act. Nor do we believe that Congress intended to offer any sort of preferred status or financial guarantees to intrastate pipelines who seek authorization to transport gas under section 311(a)(2). *See id.* at 1042 ("The purpose of § 311—so far as we are able to discern—is not to bestow special benefits on any of the parties on whose behalf it authorizes transportation (*i.e.,* interstate pipelines and intrastate pipelines as well as LDCs), but to reduce the barriers between the interstate and intrastate gas markets.").

In short, FERC's interpretation of the statutory standard is reasonable and conforms to stated Congressional policies. Thus, we will defer to FERC's interpretation of the "fair and equitable" standard and to its allocation of the risks of underutilization in setting transportation rates in this case.

### III.

Even though FERC's characterization of the statutory standard is correct there remains the question of whether the Commission has properly applied that standard in this case. As we noted above, the Supreme Court has adopted an extremely deferential standard of review toward agency determinations under the "just and reasonable" standard of the NGA. That same standard of review should apply to the "fair and equitable" standard of section 311(a)(2).

The Supreme Court has "emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts." *Permian Basin Area Rate Cases,* 390 U.S.

747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). Accordingly, when reviewing FERC's ratemaking decisions, "[a] presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.'" *Id.* (quoting *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *see Colorado Interstate Gas Co. v. FERC,* 791 F.2d 803, 806–07 (10th Cir.1986), *cert. denied,* 479 U.S. 907, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987); *Mississippi River Trans. Corp. v. FERC,* 759 F.2d 945, 953 (D.C.Cir.1985). Moreover, we "are not obliged to examine each detail of the Commission's decision; if the 'total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.'" *Permian Basin,* 390 U.S. at 767, 88 S.Ct. at 1360. *See also Mobil Oil Corp. v. FPC,* 417 U.S. 283, 307, 94 S.Ct. 2328, 2345, 41 L.Ed.2d 72 (1974); *Cities Service Gas Co. v. FERC,* 627 F.2d 1027, 1030–31 (10th Cir. 1980). The Court did note, however, that a court reviewing a Commission order "must decide whether each of the order's essential elements is supported by substantial evidence." *Permian Basin,* 390 U.S. at 792, 88 S.Ct. at 1373.[14]

■ In the context of section 311(a)(2) then, we presume that FERC's determination of a fair and equitable rate is valid, the petitioner bears the burden of showing that the approved rate is unfair and inequitable, and the elements of the order must be supported by substantial evidence. Mustang challenges two aspects of FERC's decision: the selection of actual cost data and the elimination of the minimum bill.

14. The standard of review outlined in *Permian Basin* and adopted for FERC ratemaking decisions here, is consistent with the NGPA, which requires that Commission findings of fact be supported by "substantial evidence," 15 U.S.C. § 3416(a)(4), and the Administrative Procedure Act, subjecting discretionary decisions to the "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A); *see Northwest Central Pipeline Corp. v. FERC,* 797 F.2d 918, 920 (10th Cir.1986). We choose to emphasize the Supreme Court's language here because it is more directly tailored to the question at hand.

In the two rate filings at issue, Mustang based its projected cost of service on the actual expenses of the most recent twelve-month period "adjusted for inflation and other measurable changes," and used those figures to allocate the rate base between El Paso and OG & E. Brief of Petitioner at 14. During the course of the staff panel proceeding, the staff requested that Mustang submit actual cost of service data for the year ending September 30, 1983, and then recommended that the Commission use that data in calculating the fair and equitable rate. The Commission, finding that "Mustang never explained what specific adjustments were made and the basis for any of the adjustments," adopted the actual cost data. *Mustang Fuel Corp.*, 31 FERC at 61,528.

■ Mustang argues that it is inconsistent to base rates on actual costs and projected volumes [15] and that, in so doing, FERC has departed from the methodology that it previously approved. Mustang characterizes this action as an impermissible retroactive change in ratemaking methodology.

The Commission, on the other hand, characterizes its decision as a simple choice of data, emphasizing that, in subsequent cases, it may rely on projected cost data if Mustang adequately explains its projections. *See Mustang Fuel Corp.*, 36 FERC at 61,004 & n. 8. In this case, after the initial order, Mustang attempted to explain its adjustments to the cost data through a petition for rehearing, but FERC was unpersuaded. On rehearing, the Commission once again expressed a preference for the actual cost data. "Our reason for rejecting Mustang's adjustments was that they were not adequately explained. The Statement by [Mustang] does not alleviate the concerns expressed in our order.... Unsup-

ported adjustments cannot be accepted to meet Mustang's burden of proof. Actual cost data is therefore more reliable and probative." *Id.* at 61,003.

Mustang has identified no authority to support its contention that the use of actual cost data is improper. It simply asserts that the Commission dismissed its adjustments "without a foundation or adequate rationale," and that the decision unfairly shifts costs back to Mustang. While we might view the question differently than FERC, the Commission's decision is supportable. A review of FERC rate decisions reveals that the choice of data is often disputed. *See, e.g., Permian Basin*, 390 U.S. at 800–03, 88 S.Ct. at 1377–79 (affirms Commission choice of cost data); *Lear Petroleum*, 42 FERC at 61,045 ("it is preferable to rely on the most up-to-date actual data available at the time the record is closed"); *Phenix Transmission Co.*, 32 FERC ¶ 61,096 at 61,263 (1985) (conditioning section 311(a)(2) rate approval on submission of actual data after two years of operating history); *see also* Pierce, *supra* note 8 at 479 (The "zone of reasonableness" encompasses rates based on "average costs, marginal costs, historical costs, expected future costs, individual company costs, standard costs, national costs, area costs, and a variety of noncost factors.") (footnotes omitted). Because the burden of proof in the ratemaking process rests on the pipeline, we cannot find the Commission's choice of actual cost data unreasonable. Alternatively, if we consider the selection of appropriate data as a finding of fact, we would conclude that the Commission's choice is supported by substantial evidence. *See Yaffe Iron and Metal Co. v. U.S. EPA*, 774 F.2d 1008, 1014 (10th Cir. 1985) (discussing substantial evidence standard).

---

**15.** In a decision not directly challenged by Mustang, the Commission adopted Mustang's initial approach to the volume side of the rate equation, basing the unit transportation rate on the volumes projected by El Paso and OG & E for the respective rate periods. FERC rejected a staff recommendation that the unit rate be based on the volumes projected in the initial May 1, 1981 petition for rate approval. *Mustang Fuel Corp.*, 31 FERC at 61,528. According to FERC, this approach "reflecting each year the currently projected annual volumes for OG & E and El Paso spreads the risk of underutilization of new and existing facilities between Mustang and El Paso." *Id.* at 61,531. Because El Paso was using both new and existing facilities, the Commission adopted a rate methodology which *shared* some of the risk of underutilization between Mustang and El Paso.

■ Nor do we find that FERC's choice of the actual cost data is inappropriate in this proceeding. Even though the Commission accepted projected costs in Mustang's initial filing, we do not view the selection of actual cost data in the later proceeding as a change in methodology or a retroactive allocation of costs. As the Commission noted, the burden remained on Mustang to justify any rate increases. That burden includes demonstrating the validity of the data submitted to support the increase. We note further that the Commission is not bound by any particular formula or methodology in determining rates. "Provided only that they do not together produce arbitrary or unreasonable consequences, the Commission may employ any 'formula or combination of formulas' it wishes, and is free 'to make the pragmatic adjustments which may be called for by particular circumstances.'" *Permian Basin*, 390 U.S. at 800, 88 S.Ct. at 1377 (quoting in part *FPC v. Natural Gas Pipeline Co.*, 315 U.S. at 586, 62 S.Ct. at 743).

■ Finally, we do not agree that the Commission has engaged in retroactive ratemaking. FERC regulations make clear that unapproved rates are collected subject to a later refund if the filed rates are determined to be in excess of that which is fair and equitable. 18 C.F.R. § 284.123(b)(2)(i); *see supra* note 1. We have approved this procedure in connection with FERC's approval of rates under section 4 of the Natural Gas Act, and believe the same principles apply here. *See Colorado Interstate Gas*, 791 F.2d at 806–08. The decisions relied upon by Mustang are clearly inapplicable here. *See, e.g., Natural Gas Pipeline Co. v. FERC*, 590 F.2d 664, 668 (7th Cir.1979) ("Once a rate order has become final, and no longer subject to

judicial review, any change in the rate must be made prospectively." Mustang's rates were not final.).

Mustang also argues that, even if the selection of actual cost data was appropriate, FERC has "incorrectly applied its changed methodology." In the rehearing before FERC, Mustang submitted calculations showing the "proper application of the approach." Brief of Petitioner at 27. Central to Mustang's recalculations was the use of *actual* volumes rather than those projected at the beginning of the rate period.[16]

■ FERC rejected Mustang's revised application of the rate methodology for several reasons. *See Mustang Fuel Corp.*, 36 FERC at 61,003–04. Again, with one exception addressed below, we find FERC's rationale acceptable. At the heart of Mustang's complaint is the argument that the coupling of actual costs and projected volumes "forecloses Mustang from recovering its costs of providing service." Brief of Petitioner at 30. We have already held that section 311(a)(2) does not guarantee that intrastate pipelines will recover the costs of transportation service. There is no evidence in the record that Mustang would have been unable to recover its costs if the projected volumes had actually been transported. In other words, the rate was not unfairly *designed*. Thus, we do not find FERC's application of the methodology unfair or inequitable.

■ While we affirm the Commission's use of actual cost data, however, we cannot approve the selective use of that data. In its petition for rehearing, Mustang submitted actual cost data for May 1, 1983 through April 30, 1984, covering the second

---

**16.** Obviously, there is some initial appeal to Mustang's argument that it is inconsistent to match "actual" costs and "projected" volumes. After much study, we are convinced this is a classic comparison of "apples and oranges" because cost data and volume projections serve different purposes in the ratemaking equation. Normally, because rates are calculated prospectively, regulators use projected cost and volume data. Here, because FERC's review lagged behind Mustang's frequent rate filings, actual cost data was available. Use of that data is not

necessarily a change in methodology, but a refinement of the data. In contrast, basing the unit rate on the actual volumes transported would be a substantive change in methodology, as it would guarantee that the intrastate pipeline would fully recover its costs and shift the risk of underutilization to the interstate pipeline and its ratepayers. For a discussion of the role of throughput projections in rate design, see *Producer's Gas Co.*, 35 FERC at 65,119–21 (ALJ decision); *Lear Petroleum Corp.*, 42 FERC at 61,051–57.

"locked-in" rate period. R.Vol. III at 830–32. Yet FERC continued to base the rate for this period on the actual cost data for October 1, 1982 through September 30, 1983. The order on rehearing includes no explanation of this decision. Given FERC's expressed preference for actual cost data as the "best evidence" of costs in this case, it was unreasonable to use actual cost data for a previous period when the data for the same period was in the record. FERC's failure to address this submission on rehearing forces us to conclude that the decision was arbitrary.[17] Accordingly, we modify FERC's July 1, 1986 order and direct the Commission to reconsider and recalculate the rate for the second period using the actual cost data submitted by Mustang.[18]

Mustang argues most strenuously against FERC's elimination of the minimum bill provision. As previously explained, the minimum bill provision required El Paso to pay for transportation of a minimum daily quantity of gas regardless of whether that much gas was actually transported, and it insured that Mustang would recover its costs under the Transportation Agreement. FERC rejected the minimum bill "because it imposes unwarranted risk on interstate customers by defeating the allocation of underutilization risk that we adopted ... in selecting a cost allocation and rate determination methodology." *Mustang Fuel Corp.*, 31 FERC at 61,532; *see supra* note 15; *Mustang Fuel Corp.*, 36 FERC at 61,005–07.

Mustang urges us to reinstate the minimum bill provision, arguing (1) that the minimum bill was part of the consideration for the Transportation Agreement; (2) that the minimum bill provision does not defeat the proper allocation of risk between El Paso and Mustang; (3) that elimination of the minimum bill unfairly allocates risks to Mustang; and (4) that elimination of the minimum bill is unfair and discriminatory. We fail to find these arguments persuasive.

■ Mustang argues that El Paso agreed to the minimum bill in exchange for transportation on a "firm basis" for its gas. The Commission noted, and the Transportation Agreement provides, that El Paso's needs for pipeline capacity are always subordinate to the needs of OG & E. "Thus," according to the Commission, "El Paso's 'protection' is of a limited nature. El Paso only gets to use Mustang's capacity up to the Daily Quantity level when OG & E does not need it.... [T]his is insufficient grounds to support a minimum bill." *Id.* at 61,005. We affirm FERC's reasoning and decision. Regardless of how Mustang attempts to characterize the agreement, El Paso's claims on capacity were subordinate to those of OG & E. FERC's rejection of the "consideration" argument was not unreasonable.

■ Mustang's argument that the minimum bill provision does not defeat FERC's allocation of risk is totally without merit. Under the minimum bill provision, if Mustang transported less than the daily quantity, El Paso paid all of the costs associated with the unused capacity. Mustang's costs were fully recovered whether the projected

---

17. While the order on rehearing discusses certain of the data submitted by Mustang, the cost data for May 1, 1983 to April 30, 1984 (Appendix B of Mustang's submittal) is not considered. We also find that Mustang's submittal of the actual cost data was timely, for Mustang was unaware that the Commission would use actual cost data until the June 4, 1985 order was issued. Thus, it is appropriate to allow Mustang to submit actual cost data for the second period on rehearing. In fact, the Commission implicitly invited this data in the June 4 order. *See Mustang Fuel Corp.*, 31 FERC at 61,535 ("Mustang can address through a petition for rehearing any recommendations by advisory staff that are adopted by the Commission.").

18. We recognize that FERC cannot increase the transportation rate above that filed by Mustang on May 23, 1983. According to Mustang's calculations, use of the cost data submitted on rehearing would result in a higher unit rate than was originally filed (38.91 cents vs. 34.30 cents). R.Vol. III at 830. Thus, assuming that these calculations are correct, the effect of our modification is to order FERC to find the filed unit rate "fair and equitable." Our modification regarding the cost data does not affect FERC's decision to eliminate the minimum bill provision, which we affirm.

volumes were actually transported or not.[19] We have already held that section 311(a)(2) allows the Commission to impose the risk of underutilization on the intrastate pipeline. Mustang's argument that the minimum bill provision does not reallocate the risks to El Paso's ratepayers is unavailing.

Mustang also argues that FERC's decision unfairly shifts the risks of underutilization to Mustang because, under the Transportation Agreement, the projected volumes and the minimum daily quantity are controlled by El Paso. Mustang reasons that if El Paso overestimates the capacity needed, Mustang bears the risk of underutilization. As the Commission noted, El Paso makes the initial throughput projections, but "Mustang does not have to accept such projections without question. Absent a minimum bill provision, we believe that Mustang will seek to get as accurate an estimate from El Paso as possible, so that its proposed rate will reflect its actual costs." *Id.* at 61,006. Once again, FERC has offered a reasoned explanation for its decision.

Finally, Mustang claims that FERC's order is "unfair and discriminatory." Mustang argues that FERC's reliance on a "longstanding policy against minimum bills ... for interruptible intrastate pipeline transportation," *id.*, is misplaced. We find no reason to review the history of FERC's minimum bill policy because its allocation of risk policy was well-established. *See Mustang Fuel Corp.*, 19 FERC at 61,318; *Mustang Fuel Corp.*, 20 FERC at 61,125; *see also Louisiana Resources Co.*, 23 FERC ¶ 61,445 at 61,986 (1983); *Louisiana*

*Intrastate Gas Corp.*, 18 FERC ¶ 61,034 (1982). Mustang was on notice that FERC would not approve an agreement which placed all of the risks of underutilization on the interstate ratepayers. In that sense, FERC's decision is not unfair.

The order is discriminatory, according to Mustang, because FERC approved minimum bills for interstate pipelines during the same period.[20] FERC concedes that it has allowed interstate pipelines to impose minimum bills for firm service, but distinguishes those cases from section 311(a)(2) transportation rates:

"There is a difference, however, in the regulatory oversight we exercise over inter- and intrastate pipelines. Interstate pipelines are required to obtain a certificate of public convenience and necessity under the Natural Gas Act (NGA) before constructing facilities. The Commission can thus ensure that pipelines actually have the supply and markets to justify building such facilities and that existing customers will not be burdened with unused capacity. We do not have the same regulatory authority over intrastate pipelines. In the case of Mustang, even the state commission does not regulate its rates or approve new construction. It is thus imperative that we ensure that the risks of overbuilding and underutilization are not shifted to the interstate market."

*Mustang Fuel Corp.*, 36 FERC at 61,006. FERC also points to prior section 311(a)(2) cases where minimum bills and standby charges have been disapproved. *See Tennessee Gas Pipeline Co.*, 32 FERC ¶ 61,086 at 61,227–30 (1985); *J–W Gathering*, 23

---

**19.** As FERC notes, the effect of this provision was "particularly egregious" during the October 1, 1982 through May 22, 1983 rate period because the minimum daily quantity for billing purposes exceeded the volumes projected for rate-making purposes. Thus, the minimum bill provision actually guaranteed Mustang a substantial cost over recovery. *Mustang Fuel Corp.*, 31 FERC at 61,532–33. The operation of the minimum bill provision appears "unfair and inequitable" on its face during this period. The fact that this resulted from El Paso's incorrect projections does not excuse Mustang from the burden of filing a fair and equitable rate or the Commission from ordering one.

**20.** This question was addressed in rulemaking subsequent to the initial order in this case. FERC regulations now prohibit any minimum bill provision for interruptible transportation service under section 311. *See* 18 C.F.R. § 284.9(d) (1988) ("A pipeline's rate for any transportation service provided under this section may not include any minimum bill provision, minimum take provision, or any other provision that has the effect of guaranteeing revenue."). For a discussion of FERC's recent approach to minimum bills, see Griggs, Restructuring the Natural Gas Industry: Order No. 436 and Other Regulatory Initiatives, 7 *Energy L.J.* 71, 75–79 (1986).

FERC ¶ 61,007 (1983); *Transok Pipeline Co.*, 12 FERC ¶ 61,032 (1980).

 FERC approval of minimum bills comparable to the one in the Mustang–El Paso Transportation Agreement is rare. Nevertheless, even if FERC has approved such rates for interstate pipelines, the differences in regulatory authority (combined with FERC's approach to allocation of the risk of underutilization) provide a reasoned basis for different treatment of intrastate pipelines under section 311(a)(2). Elimination of the minimum bill provision is neither unfair nor discriminatory.[21]

### IV.

Mustang next attacks FERC's ability to require refunds and impose interest on that portion of the collected rates which has been deemed in excess of a fair and equitable rate. First, Mustang argues that section 311(a)(2) prohibits FERC from ordering refunds where the result is that Mustang is denied recovery of its costs. We have already addressed this argument. Section 311 does not guarantee that costs will be recovered. Moreover, FERC regulations in effect when Mustang entered into the agreement with El Paso made it clear that section 311(a)(2) rates were subject to review and refund. 18 C.F.R. 284.-123(b)(2)(i); *see supra* note 1.

 Mustang also suggests that a refund order which forces it to repay revenues below its actual cost of service is confiscatory and unconstitutional. The Supreme Court has already foreclosed this argument: "[T]he just and reasonable standard of the Natural Gas Act 'coincides' with the applicable constitutional standards, and any rate selected by the Commission from the broad zone of reasonableness permitted by the Act cannot properly be attacked as confiscatory." *Permian Basin*, 390 U.S. at 770, 88 S.Ct. at 1361 (citation omitted); *see also Mobil Oil*

Corp., 417 U.S. at 316 n. 49, 94 S.Ct. at 2350 n. 49. The same reasoning applies to fair and equitable rates under section 311(a)(2).

 We also find that the statute generally gives FERC the authority to impose refunds. First, such authority is implicit in the direction to fashion "fair and equitable" rates. More explicitly, the NGPA gives FERC the authority to "prescribe, issue, amend, and rescind such rules and orders as it may find necessary or appropriate to carry out its functions under this chapter." 15 U.S.C. § 3411(a). Similar authority in the Natural Gas Act has been interpreted as giving the Commission broad power to fashion equitable remedies, including refunds. *See FPC v. Tennessee Gas Co.*, 371 U.S. 145, 150–53, 83 S.Ct. 211, 214–16, 9 L.Ed.2d 199 (1962); *Consolidated Gas Trans. Corp. v. FERC*, 771 F.2d 1536, 1550–51 (D.C.Cir.1985); *Skelly Oil Co. v. FPC*, 401 F.2d 726, 727 (10th Cir.1968) (citing *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 40–47, 88 S.Ct. 1526, 1542–46, 20 L.Ed.2d 388 (1968)); *Lear Petroleum Corp.*, 42 FERC ¶ 61,015 at 61,059 (1988).[22]

 Similarly, the courts have held that interest may be charged on refunds as an appropriate "means of preventing unjust enrichment." *Skelly Oil*, 401 F.2d at 729 (quoting *United Gas Improvement Co. v. Callery Properties, Inc.*, 382 U.S. 223, 230, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965)). FERC regulations require that interest be assessed on these refunds, 18 C.F.R. § 284.2(b), but Mustang argues that the imposition of refunds in this case is inequitable due to the delays in the ultimate disposition of this case, citing *Estate of French v. FERC*, 603 F.2d 1158, 1168 (5th Cir.1979). In *French*, the total delay was nineteen years; the Commission took eight years to determine a just and reasonable rate and another seven years to act on a petition for special relief. *Id.* at 1167. In contrast, the delay between Mustang's initial filing and FERC's ultimate disposi-

---

**21.** We also reject Mustang's argument that section 311 requires comparable treatment of interstate and intrastate pipelines and Mustang's undeveloped and unsupported "equal protection" claim.

**22.** We also note that the Transportation Agreement between Mustang and El Paso provided that any charges in excess of a FERC-approved "fair and equitable" rate would be refunded. R.Vol. I at 254.

tion on rehearing was less than four years. Furthermore, the record reveals that at least some portion of the delay was attributable to settlement negotiations between the parties. This delay is unfortunate, and we do not condone it, but it is not so extraordinary as to warrant relief from the interest requirement. *Cf. Louisiana Land and Exploration Co. v. FERC*, 788 F.2d 1132, 1138–39 (5th Cir.1986).

Finally, Mustang claims that it was denied due process of law by the Commission's procedures. Mustang fails to identify any specific statutory or constitutional requirement that the Commission's procedures violate. We have reviewed the relevant requirements of the NGPA and the APA in this regard and find no due process violation. *See Mustang Fuel Corp.*, 36 FERC at 61,007; *Mustang Fuel Corp.*, 31 FERC at 61,534–35; *Producer's Gas Co.*, 31 FERC ¶ 61,122 (1985). We are not free to impose additional procedural requirements beyond those required by the statutes and the agency. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

For the reasons explained above, Mustang's petition for review is DENIED IN PART AND GRANTED IN PART, AND REMANDED.